GREAT AMERICAN INDEMNITY CO.
v. BEAUPRE et al.

No. 13634.

Court of Civil Appeals of Texas. Dallas.
Nov. 9, 1945.

Dissenting Opinion Dec. 20, 1945.

Rehearing Denied Jan. 11, 1946.

R. T. Bailey, of Dallas, for appellant.

Carter & Gallagher and Ben T. Warder, Jr., all of Dallas, for appellees.

LOONEY, Justice.

This is a workman's compensation case. A. J. Beaupre, referred to herein as plaintiff, was the employe; Lockheed Aircraft Corporation, manufacturer of airplanes, the employer; and Great American Indemnity Company, the insurance carrier. Plaintiff sought compensation for loss of the use of his left leg, due to an injury to his knee, together with certain medical expenses incurred within four weeks following said injury, also the expenses of a surgical operation performed on his knee, at his insistence, after the suit to set aside the award of the Industrial Accident Board was filed. On findings made by the

jury, in answer to appropriate issues submitted, judgment was entered in favor of plaintiff for compensation for 200 weeks at $20 per week, for two items of medical expenses—one aggregating $59 for expenses incurred within four weeks after date of injury and the other $293.50 for expenses incurred for the surgical operation.

The suit was begun by an appeal from the award of the Industrial Accident Board filed in the court below by defendant herein; plaintiff answered, and in a cross action alleged at length the essential facts constituting his claim for compensation and, as his claim was not filed with the Accident Board until after the expiration of six months from date of injury, plaintiff made rather lengthy allegations showing good cause for failure to file his claim within the six months period. Aside from certain special exceptions urged, defendant answered by a general denial, and specifically, that plaintiff's alleged disability was not attributable to any injury sustained in course of his employment; but, if mistaken in this, that such disability was confined to his left leg; was partial and temporary in nature, and. if it had not at that time ceased to exist, would within a short period; that from February 8, 1943, date of injury, until on or about April 27, 1944, plaintiff remained in his usual employment and received larger wages during such period; that if he had suffered any disability, it was of a minor nature and did not affect plaintiff's ability to retain employment. Defendant further alleged that plaintiff's disability, if any, was the result of an occupational disease, as distinguished from an accident sustained in course of employment.

In answer to special issues the jury found that on February 8, 1943, while working for the employer, plaintiff sustained an accidental injury which, beginning on date of injury, caused plaintiff to sustain total and permanent incapacity to his leg; that same did not result from disease; and on the issue of good cause for failure of plaintiff to file his claim within the six months period from date of injury, the jury found that on or about May 11, 1943 (within the six months period), W. W. Wilson (defendant's adjuster), represented to plaintiff that he, Wilson, would investigate the claim, report the result of such investigation to his company

(defendant herein), and advise plaintiff whether or not defendant would allow same, and that plaintiff should leave everything to him (Wilson); that plaintiff believed and relied upon the representations of Wilson and was induced thereby to delay filing his claim for compensation with the Accident Board until it was in fact filed (on or about October 8, 1943). The jury also found that up to the time plaintiff filed his claim with the Board, he didn't believe the injuries sustained by him were serious in nature; and failure to file the claim until it was filed was due to his belief that such injuries were not of a serious nature. The jury further found that on September 23, 1943 (which it seems was the date Wilson informed plaintiff that defendant rejected the claim), Wilson represented to plaintiff that he (Wilson) would endeavor to get his company (defendant herein) to provide plaintiff with a surgical operation and reimburse him for all medical expenses incurred—which the jury found Wilson failed to do. The jury also found that plaintiff believed and relied upon the representations of Wilson in this respect, and was induced thereby to delay filing his claim for compensation with the Board until it was filed; also found that by reason of plaintiff's belief in and reliance upon the several representations made him by Wilson, and plaintiff's belief that his injuries were not of a serious nature, that, in failing to file his claim for compensation with the Accident Board until it was filed, plaintiff acted as an ordinarily prudent person would have acted under the same or similar circumstances.

██ The findings of the jury, in our opinion, were authorized by both pleadings and evidence, and are adopted as our conclusions on the respective fact issues.

In its Sixth point of error the defendant contends that the evidence was insufficient to show that plaintiff sustained the injury complained of in the course of his employment.

As heretofore stated, the jury found that on February 8, 1943, while working for Lockheed Aircraft Corporation, plaintiff sustained an accidental injury to his left leg. This finding, in our opinion, was authorized by undisputed evidence; in fact, defendant failed to brief the point and referred to it in such manner as to indicate

the point was not urged with any thought that it would provoke serious consideration. In its brief the defendant states: "We could admit there is evidence to support the jury's finding to the effect that Beaupre did sustain an injury in the course of his employment as claimed by him, but because we have no faith in such claim, we do not do so." We therefore overrule defendant's Sixth point.

Defendant's Second, Fourth, Fifth and Seventh points of error combined, present for our consideration but one question; that is, that plaintiff failed to show good cause for failure to file his claim for compensation with the Accident Board within six months after the occurrence of same.

■ The evidence bearing upon the above issues is lengthy and it would serve no useful purpose to make quotations therefrom; however, we examined same carefully and reached the conclusion that the findings of the jury on the several questions clustering around the main issues as to whether plaintiff showed good cause, were authorized by the evidence; so we adopt these findings as our conclusions of fact on the question.

It seems that immediately after receiving his injury, plaintiff went to the first aid station and consulted Dr. Carroll, the employer's physician, who seemed to think the injury was trivial and instructed plaintiff to return to his work; again on February 12, a few days after the injury, plaintiff being in Dr. Carroll's office, the lady clerk, Mrs. Williams, filled out a blank to be filed by plaintiff with the Accident Board as his claim for compensation for the injury. On inspection, Dr. Carroll, according to testimony of plaintiff, tore up the report prepared by Mrs. Williams, stating he did not consider that plaintiff's injury constituted an accident claim. And on and on, throughout the year, even up to October 1943, according to testimony of plaintiff, Dr. Carroll discounted the seriousness of plaintiff's injury and continuously advised him that the swelling and pain would depart and that no permanent results would be suffered. About May 1943, plaintiff encountered Mr. Wilson, defendant's adjuster, who assured plaintiff that he (Wilson) would investigate the case, report to the company, and inform plaintiff of the result; and this hope was held out by Wilson to plaintiff until in September 1943,

after the expiration of the six months period, when, for the first time, Wilson informed plaintiff that the defendant would not pay the claim. However, at that time and in this connection, assured plaintiff that he (Wilson) would endeavor to secure an agreement from the defendant to give plaintiff a surgical operation and compensation for all medical expenses incurred. Plaintiff had no direct and positive knowledge that defendant would not give him a surgical operation, pay the expenses thereof and compensation for the injury, until October 5, 1943, a few days before his claim was filed. This information was contained in a letter from defendant, presumably to Dr. Carroll, and was read in Dr. Carroll's office. Upon the whole, we think the evidence fully sustained plaintiff's contention that reasonable cause existed for his failure to file the claim earlier than it was filed.

Cases bearing upon the question of good cause are numerous, and only a few of the most pertinent will be cited. The most analogous, we think, are Federal Underwriters Exchange v. McDaniel by the Beaumont Court of Tex.Civ.App., 140 S. W.2d 979 (app. dis. cor. judg.); Consolidated Underwriters v. Pruitt by the Amarillo Court of Civ.App., 180 S.W.2d 461 (app. dis.); Gulf Casualty Co. v. Taylor, Beaumont Court of Civ.App., 67 S.W.2d 415 (app. dis.). In Lacour v. Continental Casualty Co., Tex.Civ.App., 163 S.W.2d 676 (app. dis.), the Galveston Court said that the test for "good cause" of delay in filing a claim before the Board is that of ordinary prudence; that is, whether the injured employe has prosecuted his claim for compensation with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances, and that ordinarily the question as to whether such diligence was used is one of fact.

■ In Hranicky v. Trojanowsky, Tex. Civ.App., 153 S.W.2d 648 (app. dis.), the Galveston Court said that under a long settled rule of procedure, as against the contention that a finding of fact by the jury is without support in the evidence, the testimony in support of the verdict must be weighed to the exclusion of any evidence of a contrary import. It follows that under this rule plaintiff's evidence must be given exclusive consideration in determining the sufficiency of the evidence

to support the verdict. We, therefore, overrule defendant's Second, Fourth, Fifth and Seventh points of error.

Defendant's Third point presents the contention that the finding of the jury to the effect that plaintiff's injury caused total and permanent loss of the use of his left leg, is not supported by competent testimony and is so against the weight of the evidence as to shock the conscience.

█ The evidence, in our opinion, authorized the verdict, but is entirely too lengthy to be reproduced here; but it may be summarized. In short, it shows that when stepping up into an aircraft on which he was working, plaintiff became overbalanced; his full weight was thrown on his left leg, twisting the knee and, as later disclosed, rupturing a cartilage that worked in between the knee joint, which at times caused the joint to lock; swelling and pain immediately ensued and grew progressively worse, varying in intensity, dependent upon length of time plaintiff stood on his feet; although the knee was painful and swollen, plaintiff continued to work; several times was given lighter work to lessen the pain; such work, however, required him to stand upon his feet, until in October 1943, he was given a bench job; pain and swelling in his knee required daily treatment, that is, application of hot towels and liniments, and often sleeping powders were taken to produce rest at night; a few days after receiving the injury, plaintiff's leg from foot to hip was put in a cast by Dr. Bywaters, to whom plaintiff was sent by employer's physician, Dr. Carroll. The cast, worn for about two weeks, was painful during the entire time, and when removed plaintiff's knee was badly swollen. After removal of the cast, plaintiff wore an elastic leg support until the surgical operation on his knee was had in April 1944. His left leg is so stiff and rigid that, in walking, plaintiff slings it as he would if wearing a wooden peg. Testified that he realized the seriousness of his injury for the first time in April 1944, and thereupon consulted Dr. Hurt, an osteopath, who testified that at time he examined plaintiff's knee it was badly swollen. Dr. Hurt gave plaintiff no treatment, but referred him to Dr. Gibbons, a surgeon, who advised and performed an immediate operation on the knee. After the operation plaintiff was confined in a hospital for about three months, after which he resumed his work. Testimony shows that the operation relieved plaintiff of some of the pain, but it persisted, nevertheless, and when he stands upon his feet for an hour or hour-and-a-half, pain is more intense and the swelling recurs. At time of the trial, about twenty months after the injury was received, plaintiff's left knee was approximately three times the size of the knee on his right leg; and when his left leg was bent as far as could be, the portion of the leg below the knee and that above formed a right angle. Plaintiff was corroborated, insofar as she testified, by his wife who testified to the daily treatment of plaintiff's knee with hot towels, liniments, etc., and as to his method of walking.

Dr. Hurt, as an expert, testified that plaintiff may regain a small amount of the lost use of his leg, but even that is questionable, as sufficient time since the operation has elapsed for the maximum recovery to manifest itself; that the leg will never have the strength it formerly had, because of the knee operation; that plaintiff's incapacity to labor in the future will depend upon the type of work; in the performance of labor requiring plaintiff to be on his feet for any length of time, or to bend, squat or lift, his capacity would be restricted and such labor would be calculated to cause additional swelling, and such restriction might last the balance of his life. The witness expressed the opinion that plaintiff had lost about 50 per cent of the use of his left leg permanently; stated that he might be able to do something else, but as to labor that would require stooping, bending and lifting, plaintiff might perform same for a little while, but would never be able to do that kind of work and keep it up. As to that type of work, witness expressed the opinion that plaintiff's loss of the use of his limb would exceed 50 per cent; that in time there would be further improvement, but said: "I don't think he could hold a job now that would require him to be on his feet all the time and stooping and bending"; and as to whether he will ever be able to hold a job requiring that, said: "I would hesitate to say; it is possible that he would not ever be able to do it, and again he might receive sufficient amount of improvement in time that would permit him to hold that type of work." The witness said he didn't mean to tell the jury that plaintiff is not now able to work, but said: "I simply stated the type of work that

would keep him on his feet or involve his knee—there could be types of work that he could do better than others if he was trained for them; I mean those kinds that would keep him off his feet"; testifying as to whether the percentage of disability was a mere difference of opinion, witness answered "Yes"; was then asked:

"Q. And your opinion may be in accord with or at variance with the next examiner? A. Yes.

"Q. Another doctor may say the man has a one-hundred percent disability? A. Yes.

"Q. Or another may say twenty-five percent? A. Yes."

Testimony in the case shows that plaintiff is not qualified, either from educational training or otherwise, to perform other than manual labor. As before stated, the jury found that incapacity to his left leg was total and that such total incapacity was permanent.

The question under consideration is this: Does the record disclose evidence from which reasonable minds could find that plaintiff's injury was total and permanent in the sense that he was incapacitated to perform the usual and customary work of a manual laborer? See Standard Accident Ins. Co. v. Williams, Tex.Com.App., 14 S. W.2d 1015.

It is undisputed that plaintiff was not qualified, either from education or training, to perform other than the usual tasks of a manual laborer. As before stated, the jury found his injury both total and permanent, and the evidence, in our opinion, was sufficient to support that finding.

However, it is contended by the defendant that as Dr. Hurt, plaintiff's witness, testified he had suffered only a 50 per cent loss of the use of his leg, the same was conclusive on that issue; hence the finding of the jury to the contrary was unauthorized by the evidence.

It is true Dr. Hurt expressed the opinion that plaintiff had lost "about 50 percent of the use of his leg" and that this loss would be permanent; but that was not all the witness said in that connection. He stated that, in his opinion, plaintiff would never be able to perform for any length of time, or keep it up, labor requiring him to be on his feet, to lift, stoop or bend; that as to such types of work, plaintiff's loss of the use of his limb would exceed 50 per cent; and as to whether plaintiff

would ever be able to hold a job requiring such work, witness said: "I would hesitate to say; it is possible that he would not ever be able to do it, and again he might receive sufficient amount of improvement in time that would permit him to hold that type of work." The witness also said that the percentage of disability suffered by plaintiff was a matter of opinion; that another doctor may say the loss sustained was 100 percent, still another only 25 percent, etc.

■ However, if it be assumed that Dr. Hurt testified unqualifiedly that plaintiff had suffered only a 50 per cent loss of capacity, yet that would not be conclusive, as the jury, notwithstanding, would have the right to conclude from other evidence that the loss of capacity was total and permanent. In Southern Underwriters v. Sanders, Tex.Civ.App., 110 S.W.2d 1258, 1260, where the only physician expert to testify said that in his opinion plaintiff had suffered only 50 per cent loss of the use of his foot, whereas the jury found he has sustained a loss of 60 per cent, the court, answering a contention similar to the one in the instant case, said: "Even though this is the only opinion in the statement of facts as to the percentage of partial loss of the use of the foot, we do not think it is conclusive and binding on the jury. The jury would be entitled to form their own conclusions from all the evidence in the case, and this would be more particularly true when the expert witness himself admits that the percentage is a mere difference of opinion. We think the testimony as a whole supports the jury finding of 60 per cent. partial loss of the use of plaintiff's foot." Also see El Paso Electric Co. v. De Garcia, Tex.Civ.App., 10 S.W.2d 426; Lott v. American Surety Co., Tex.Civ.App., 140 S.W.2d 928. Other pertinent authorities are Traders & General Ins. Co. v. Maxwell, Tex.Civ.App., 142 S.W.2d 685; Texas Employers Ins. Assn. v. Hevolow, Tex.Civ.App., 136 S.W. 2d 931; Texas Employers Ins. Assn. v. Long, Tex.Civ.App., 180 S.W.2d 629. Therefore, appellant's Third point of error urged for reversal is overruled.

In its First point of error defendant contends that the court erred in permitting plaintiff to recover $293.50 expenses incurred incident to a surgical operation he caused to be performed on his left knee about April 27, 1944, during pendency of the suit.

Defendant contends that, as the surgical operation was performed at the insistence of plaintiff after the suit to set aside the award of the Accident Board was filed, without having been previously presented to the Accident Board, the court was without original jurisdiction to entertain the claim. The facts bearing upon this point of error are as contended by the defendant; but, even so, we think the court had jurisdiction to adjudicate the validity whether or not of the claim for expenses incident to the surgical operation. Suit having been filed by defendant to set aside the award of the Board, and plaintiff having filed answer thereto, the Accident Board lost jurisdiction of the matter. The right of plaintiff to be reimbursed for expenses incurred for the operation, was an incident to and a part of compensation the statute gives an injured employe and, in our opinion, was recoverable, regardless of the fact that it was never asserted before the Accident Board. See authorities in point, Aetna Life Ins. Co. v. Culvahouse, Tex.Civ.App., 10 S.W.2d 803, 805, and authorities cited; Traders & General Ins. Co. v. Huntsman, Tex.Civ.App., 125 S.W.2d 431, 435, 437 (app. dis.); 45 Tex.Jur., p. 779, sec. 282. We, therefore, overrule the contention that the court below was without jurisdiction to pass upon the validity whether or not of the claim under consideration.

It is admitted that neither party made any demand in writing or otherwise upon the Accident Board for a surgical operation on plaintiff's knee before it was performed, and in this respect neither sec. 7 nor sec. 12e of Art. 8306, R.C.S., Vernon's, was complied with. The operation having been performed over fourteen months after the occurrence of the accident, we do not think sec. 7 had any application; but if sec. 7 or sec. 12e under ordinary circumstances should have been complied with, yet as defendant had denied all liability to plaintiff, we do not think it was incumbent upon him to comply with the provisions of these sections of the statute before having the operation performed, as a condition precedent to his right to recover compensation for the operation. See Security Union Cas. Co. v. Roberts, Tex.Civ.App., 298 S.W. 164, 169 (writ ref.).

Again, we do not think plaintiff was required to comply with the provisions of the statute under consideration, as a condition precedent to the right to recover expenses of the surgical operation, in that we think the evidence shows and the jury so found (special issue No. 22) that an emergency that would not brook further delay existed requiring the operation immediately. See Ocean Accident & Guarantee Corp. v. Nance, Tex.Civ.App., 25 S.W.2d 665; Aetna Life Ins. Co. v. Harris, Tex.Civ.App., 83 S.W.2d 1087, 1090.

It follows from what has been said that we do not think defendant's points of error are well taken; hence are overruled and the judgment of the court below is affirmed.

Affirmed.

BOND, Chief Justice (dissenting).

The Texas Workmen's Compensation Law is an elective Act. In certain designated employments it is exclusive, governing employes and specifying compensation for injuries sustained in course of employment, provided the injuries are within the contemplation of the Act and the injured employe or his dependents comply with the terms thereof. An action for statutory compensation is not founded on tort but on an implied contract in which the Legislature has prescribed the terms and conditions upon which a claim for compensation may be recovered; and courts have frequently announced the sound and humane rule that such contract should be liberally construed with a view to accomplishing the beneficent purposes of the legislation. Any reasonable doubt that may arise as to the right of an injured employe to compensation, courts will solve in favor of that right.

The rights, duties and responsibilities are reciprocal. In case of injury, sec. 18a, Art. 8308 R.S., of the Act, provides that the employer upon securing a policy shall give notice to the Accident Board that he has contacted the association (insurance carrier) for payment of compensation for the employe's injuries. The association (insurance carrier) is required to make a similar report. Willful failure or refusal to report subjects the offender to a penalty. Secs. 19 and 20 provide for the giving of notice to all persons under contract of hire with the employer and persons with whom the employer is about to enter into contract of hire, which notice

is essential to the employer's obtaining the exemptions of liability as provided in the Act. Sec. 3c, Art. 8306, provides that the notice required by secs. 19 and 20 is accomplished by the filing of the notice with the Industrial Accident Board, which will constitute notice to the employe. Secs. 3a and 3b of the Act provide that unless the employe gives notice to the employer that he declines to accept employment under the terms of the Act, he is bound by it and his rights are controlled thereby. Sec. 4a, Art. 8307, provides that such employe shall give notice of an injury to the association (insurance carrier) or subscriber (employer) within thirty days after the happening thereof and shall make claim for compensation to the Industrial Accident Board within six months after the occurrence of same; and further, for good cause, the board may in meritorious cases waive strict compliance with notice and the filing of the claim.

Thus it will be seen that the employe accepting employment under the terms of the Act voluntarily agrees that the provisions of the compensation law shall govern his dealings; that is, the law becomes a part of the contract of employment and where a compensation policy is written under the terms and provisions of the Act, its terms and provisions become binding upon all of the parties concerned. The statutory requirements as to all the notices, and the actions of the board, are of the essence of the contract, unless there be a waiver or estoppel; and, since all relevant statutes enter into and become a part of the insurance, they must be considered with reference to it. Courts should not by construction attempt to make a new contract for the parties.

From the language of the statute above set out, it is clear that an employe who is neither physically nor mentally incapacitated by his injury must file his claim for compensation with the Industrial Accident Board within six months after the occurrence of the injury, and if he omits to do so, recovery of compensation is precluded, unless he can show "good cause" for such delay. The duty to give notice and make claim within the time is mandatorily imposed on the employe; delay is fatal. While the statute authorizes the board for good cause to waive strict compliance with the requirements of notice and filing of claim, it wholly fails to define the term "good cause." Courts appear to

agree that the employe must show that he has prosecuted his claim with that degree of diligence which would be exercised by a person of ordinary prudence in the same or similar circumstances. It follows, therefore, that when negligence or indifference is shown, the board, or the court on appeal, is duty bound to deny compensation.

In all such cases where "good cause" is an issue, the burden is upon the claimant to show that he was free of negligence or indifference from the time of his injuries to the very time he acted. Williamson v. Texas Indemnity Ins. Co., 127 Tex. 71, 90 S.W.2d 1088; Ocean Accident & Guarantee Corp. v. Pruitt, Tex.Com.App., 58 S.W.2d 41; Holloway v. Texas Indemnity Ins. Co., Tex.Com.App., 40 S.W.2d 75; Maryland Casualty Co. v. Johnson, Tex.Civ.App., 87 S.W.2d 342, error dis.; Texas Employers' Ins. Ass'n v. Sitchler, Tex.Civ.App., 76 S.W.2d 145; Texas Employers' Ins. Ass'n v. McGehee, Tex.Civ. App., 75 S.W.2d 123. In the case at bar, as I interpret the record, the injured employe offered no sufficient cause for the long delay from February 8, 1943, date of the injury, to October 8, 1943, date of filing of his claim for compensation. Hence, as a matter of law, his claim is barred by the statute.

To sustain the issue of good cause, the claimant relied on his own testimony, corroborated by that of his wife, not supported or contradicted by any other evidence. He testified unequivocally that he had known since February 8, 1943, that he had a serious condition in his knee; that on February 12, his knee hurt him so badly that he reported to the first aid station maintained by his employer, and at that time his knee and leg "was swollen and turning blue around the joint"; that on February 15, he went to see a Dr. Bywaters who placed him in a hospital and next day put a cast on his leg from foot to hip, which remained thereon for about two weeks, and, when removed, his leg "was swollen twice the size it was"; that on March 6, he went back to see Dr. Bywaters who, upon examination of his condition, wrote a letter to his employer stating that he should be given work that would take him off his feet—"that he was not able to work on that job"; which resulted in his employer's placing him on a bench job on May 12. His leg was still swollen. This testimony is in line with his pleading in which he alleged that "to-

tal incapacity of the leg has existed since the date of the injury—8th of February, 1943." Mrs. Beaupre testified that she also knew from the very day of the accident that Mr. Beaupre had a serious condition with his knee, and that she and her husband had treated and doctored his condition every day and night. In order that there may be no mistake about the testimony on which plaintiff relied, in the interest of fairness to the record, I quote literally the testimony:

Beaupre testified:

"Q. You have known since February 1943, that you had a serious condition with your knee, haven't you, Mr. Beaupre? A. Yes—Yes, serious—I knew from the pain.

"Q. You knew it was paining you and affecting your ability to get around? A. Yes, sir."

Mrs. Beaupre, claimant's wife, testified:

"Q. Mrs. Beaupre, on the night of February 8, 1943, when Mr. Beaupre came home from work, did you observe his knee? A. Yes, sir, I did.

"Q. Tell the jury what you saw and observed when you looked at his knee that evening? A. He came in and could hardly make it in the house * * * He just showed me his leg; it was bruised and swollen and I put epsom salts towels on it, and the next morning it was so stiff he could hardly walk; I did not think he would be able to go to work.

"Q. How badly swollen was it? A. Awfully bad.

"Q. Was it discolored? A. Yes, yellowish and bluish.

"Q. Mrs. Beaupre, had there been anything wrong with his knee before that? A. Not that I recall.

"Q. Was his knee all right when he left for work on the morning of February 8th? A. Yes, it was.

"Q. Did you continue to observe his knee? A. Yes, I had to treat it every night; I packed it with hot towels and liniment.

"Q. Did his knee appear to be stiff? A. Yes, he could not hardly get around at all; he had to sling his leg in walking.

"Q. Just go ahead and relate what happened and what you observed about his knee and how it affected him— A. He would come in suffering every night, and we could not give him any relief; it was stiff, he could not even go up and down steps.

"Q. Did that condition get worse? A. Yes, and the pain got worse; he could not hardly stand it. * * *

"Q. After Mr. Beaupre was injured did he wear anything on his knee? A. Yes.

"Q. What? A. A cast for two weeks clear to his hip, and then after that an elastic leg support until he was operated on.

"Q. When the cast was removed from the leg, will you describe his leg? A. It was still stiff and bruised around the knee— the knee cap was just about twice the size of an ordinary knee.

"Q. Did that swelling continue? A. Yes, a bag forming under his knee, it looked like it might be full of pus.

"Q. Did he complain of pain? A. He certainly did; he had to take rest medicine the doctor prescribed.

"Q. Do you remember when he started taking those? A. It was after he saw Dr. Bywaters.

"Q. How long did he continue taking them? A. Until he was operated on. * * *

"Q. What was the condition of Mr. Beaupre's knee when he came home from the hospital after the operation? A. Well, it was in a cast when he first came home and stayed there several weeks, but it was swollen and the doctor had to treat it, had to drain the fluid three times.

"Q. Where was that done? A. At the hospital.

"Q. All right; then after the cast was removed, what was the condition of his knee? A. It was still swollen and stiff and still was discolored slightly all around."

On this testimony the majority opinion seems to say that Beaupre did not know his condition from time of the accident until he saw Dr. Hurt in April of the year following, after his suit had been filed, due to the fact that he did not know his condition; hence excuse him from filing the claim before October 8, 1943.

The testimony in this case further shows that in February 1943, the claimant presented his claim for injuries to John Hancock Life Insurance Company, with whom he carried sick and general debility insurance; that he undertook to get that com-

pany to pay his expenses for treatment to his knee and leg and for an operation thereon; that after that company turned him down, on May 11, 1943, he had his first contact with Mr. Wilson, claim adjuster for the insurance carrier, who, he claims, agreed to take that matter up with appellant herein. The testimony further shows that throughout the summer of 1943, and even in his letter to the Industrial Accident Board, dated October 7, Beaupre was trying to get someone to pay for an operation—never sought compensation; that in his testimony he expressly branded as untrue the allegations in his petition that Wilson told him not to file a claim with the Industrial Accident Board.

Indeed, the jury found on submitted issues that Mr. Beaupre thought his injuries were not serious, resulting in his failure to file claim for compensation until October 8, 1943; and, it seems, the majority of this court underwrites that holding, notwithstanding Beaupre's testimony and that of his wife that they did know his serious condition all the time from date of injury to the time he filed his claim. In other words, the injured employe and his wife are thus found not to know what they were talking about. May a court so find, in fairness to the interest and purpose of the statute and in justice to the parties concerned, in view of the admitted facts in this case?

In Employers Liability Assur. Corp., Ltd., v. Crawford, Tex.Civ.App., 149 S. W.2d 1005, 1006 (writ dis. correct judg.), the court, on facts strikingly similar as here, held:

"On the facts it is evident that the plaintiff showed no good cause for the long delay in filing his claim. Apparently he knew just as much about his alleged injury a few months after it happened, as he knows now. There was no evidence raising the issue of good cause. V.Ann. Civ.Stat., Art. 8307, sec. 4a; Petroleum Casualty Co. v. Dean, 132 Tex. 320, 122 S.W.2d 1053."

See also Southern Security Co. v. Inabnit, Tex.Civ.App., 1 S.W.2d 412; Petroleum Casualty Co. v. Garrison, Tex.Civ. App., 174 S.W.2d 74, error refused. In Southern Security Co. v. Inabnit, supra, Judge Hickman, writing for the Eastland Court of Civil Appeals, announced the rule [1 S.W.2d 415]:

"The testimony of a party to a suit and admissions made by him must be construed as binding upon him, and not merely as raising issues of fact. His testimony is governed by different rules to those governing witnesses who are not parties." (Citing authorities).

Thus when Beaupre and his wife solemnly declared that he was seriously injured, and was totally and permanently disabled, for which he was awarded full compensation from the date of such injury, he may not be allowed to say that he did not know his condition was serious, and thus rely on the belief that his injury was trivial. If he believed it was trivial to sustain a plea of good cause, evidently such would not sustain the finding of permanent total disability from the date of the injury. His testimony should be given the weight and credibility that it deserves, and the finding be consistent therewith.

"A party cannot recover upon a theory which embraces existence of a set of facts which such party testifies unequivocally are not true." Clack v. Williams, Tex.Civ. App., 189 S.W.2d 503.

In Petroleum Casualty Co. v. Garrison, supra, on facts which I submit are similar to those here, to which I invite a reading, the court announced [174 S.W.2d 77]:

"The rule seems now well established by decisions of our Supreme Court that when no incapacity immediately follows the injury, good cause is shown as a matter of law for not filing claim up to the date incapacity begins, but where claim is filed more than six months (as here) after the original injury and incapacity has resulted it is necessary to show the existence of good cause during the period from the beginning of incapacity to the date the claim is filed." (Citing authorities.)

Thus it will be seen that Beaupre knew he had a serious condition with his knee in February 1943, immediately after the accident; hence he could not believe his injury was trivial. If it was trivial, then he cannot urge same as an excuse for his failure to file his claim during the period from February 8 to October 8, 1943. It is too plain for words that he was in one breath trying to swear for total and permanent disability compensation from the time of his injury; and in the next breath trying to swear for an excuse that his injury was trivial or that he believed such

was the case; and, then, swearing that he was in a serious condition, evidenced by pain, swelling of his leg, disabled to perform the task of a laboring man, could not sleep or rest. Truly, "Consistency, thou art a jewel."

If, because of Dr. Carroll's advice, any excuse ever existed leading him to believe that his injuries were trivial, or Wilson advised him that he (Wilson) would take the matter up with his company, such was dispelled when Wilson, on September 23, told him that appellant "denied all liability on his claim." In Odom v. Indemnity Ins. Co., Tex.Civ.App., 111 S.W.2d 1143 (writ dis.), authorities cited, the court holds that all of the period from date of accident (February 8, 1943) to date claim is filed (October 8, 1943) must be accounted for; that "good cause" must be a continuing condition; failure to account for time breaks or periods is fatal to the right of recovery. On the uncontroverted facts it is evident that plaintiff at no time showed good cause for the delay in filing his claim. The filing being jurisdictional (Holloway v. Texas Indemnity Co., Tex.Com.App., 40 S.W.2d 75; Ocean Accident & Guarantee Co. v. Pruitt, Tex.Com.App., 58 S.W.2d 41; Petroleum Casualty Co. v. Dean, 132 Tex. 320, 122 S.W.2d 1053), this cause should be reversed.

Furthermore, the alleged accident happened, if it did happen, on February 8, 1943. The board made its award on February 1, 1944. Suit to set aside the award was filed on February 28, 1944, and the operation performed April 27, 1944. The item of $293.50 is not recoverable. Art. 8306, secs. 7 and 12e; Lumbermen's Reciprocal Ass'n v. Wilmoth, Tex.Com.App., 12 S.W.2d 972; Indemnity Ins. Co. v. Garsee, Tex.Civ.App., 54 S.W.2d 817; Maryland Casualty Co. v. Merchant, Tex.Civ. App., 81 S.W.2d 794; Federal Underwriters Exchange v. Brigham, Tex.Civ.App., 184 S.W.2d 849. These items of expense were incurred over 14 months after the accident. No claim was ever presented to the Industrial Accident Board. In all cases cited by the majority, the expense accounts were before the board and passed on by the board.

For the errors presented, the judgment should be reversed and here rendered for appellant; or, at least, reversed and remanded to the court below for a new trial. I respectfully dissent from the majority.