# GREAT AMERICAN INDEMNITY CO. v. KINGSBERY.

## No. 5769.

Court of Civil Appeals of Texas. Amarillo.
March 17, 1947.

Rehearing Denied April 28, 1947.

Crenshaw, Dupree & Milam, of Lubbock, for appellant.

·Campbell & Adams and Vickers & Vickers, all of Lubbock, for appellee.

STOKES, Justice.

Appellee Billie R. Kingsbery filed this suit in the District Court in the nature of an appeal from an award of the Industrial Accident Board and prayed for judgment against the appellant as for total and permanent disability, together with items of expenses incurred by him for medical and hospital services. He alleged that on February 24, 1946, he was employed by Clent Breedlove, who owned and operated an airport at Lubbock under the name of Clent Breedlove Aerial Service, and that appellant carried the compensation insurance provided by Article 8306 et seq., Vernon's Revised Civil Statutes. He alleged that on the date aforesaid he was injured as a result of the crash of a glider in which he was riding and that his injuries consisted of a fracture of his left leg in two or more places, as a result of which it was amputated below the knee; that the heel of his right foot and his right thigh were frac-

tured and that as a result thereof he could not use it for manual labor; that his skull and head and the bones in the region of his right eye were fractured and the sight of his right eye was impaired; that two or more of his teeth were broken, necessitating extraction of the roots and the use of a dental plate; that the nerves, muscles and ligaments in his legs and other parts of his body were torn and lacerated and he was generally disfigured; that he sustained bruises and cuts over his entire body; that he became unconscious as a result of his injuries; and that by reason of his injuries he was totally and permanently incapacitated and rendered unable to labor and earn money or obtain employment to do manual labor or to retain such employment and perform the labor required of a workman.

Appellant answered by the general issue and specially denied that appellee received his injuries while in the course of his employment with Clent Breedlove Aerial Service, but alleged they were received while he was engaged in activities wholly outside the scope and course of his employment.

The case was submitted to a jury upon special issues, in answer to which the jury found that appellee sustained injuries while in the course of his employment with Clent Breedlove Aerial Service; that such injuries extended to and affected other portions of his body and health generally; that by such injuries he was rendered totally incapacitated from February 24, 1946; and that such incapacity was permanent and not temporary. The jury further found that there were workmen of the same or similar class as appellee doing the same or a similar class of work for substantially the whole of the year immediately preceding the date of the injury and that the average daily wage earned by them was $10 per day. Other findings were to the effect that it was necessary and proper for appellee to incur hospital bills and medical services for the proper treatment of his injuries and that during the first 28 days such services amounted in the aggregate to $2,146.10.

Based upon the verdict of the jury, the court rendered judgment in favor of the appellee for the total sum of $8,825.66, which included the amount found by the

jury as necessary medical and hospital fees and expenses during the first 28 days following the injury. Appellant duly excepted to the judgment, gave notice of appeal and has perfected an appeal to this court. Numerous assignments of error are presented and urged, but we do not deem it necessary to discuss them in detail.

The controlling issues have reference first, to the manner in which the case was submitted to the jury, appellant contending that the court erred in refusing to submit a number of special issues requested by it pertaining to specific injuries and, secondly, that the findings of the jury to the effect that appellee was engaged in the course and scope of his employment at the time he was injured was without support in the testimony.

The record reveals that Breedlove's airport was equipped with buildings, hangars, runways and other structures necessary for the proper operation of such an establishment; that he owned 10 airplanes and about 35 others were stored in his hangars, for which he charged monthly rentals. It is further shown that he maintained a machine shop for repairing airplanes, motors and the like, and that he maintained a kind of school for training and instructing students in the art of flying airplanes. Appellee was an experienced pilot of powered airplanes and he was employed by Breedlove as a pilot and instructor. His duties were to fly such airplanes as were owned and operated by Breedlove, to repair motors and airplanes when necessary, to instruct students in the art of flying and generally to perform such other tasks as were necessary about the institution. Breedlove maintained a sales service and sold airplanes to the public and appellee was one of his salesmen. Breedlove also owned a glider but it was not in use and had never been used in connection with the airport. While appellee was a skilled pilot of airplanes, he had never acted as pilot of a glider nor even ridden in one. M. I. Hall owned a glider which he kept stored in one of Breedlove's hangars and, prior to February 24, 1946, he had made a number of flights in it and each time he did so the glider was towed aloft by one of Breedlove's airplanes. On some of these occasions appellee acted as pilot of the tow-plane and on others the manager of the airport, Val Williams, acted as pilot thereof. On February 24, 1946, about noon, Hall decided to make a flight in his glider. It was a two seated affair and there had been some talk about appellee and Val Williams going up in the glider with Hall. The glider was moved from the hangar to the runway and Williams made the remark to appellee in effect that "You go up with him the first flight and I will go up with him the second one". Hall got into the rear seat and appellee got into the front seat of the glider and Williams got into one of Breedlove's airplanes. The glider was attached to the airplane and towed down the runway and into the air to a height of some 2000 feet, where it was released and appellee and Hall glided about over the area for some 10 or 15 minutes. The glider was equipped with dual controls and after it was released from the airplane Hall observed that appellee was adept at the controls and permitted appellee to pilot the glider practically the entire flight. When they were descending to the runway and had reached a height of about 200 feet the glider suddenly made a "nose dive" and crashed against the ground. As a result, appellee's left foot and a portion of the left leg were crushed and broken so that its amputation below the knee became necessary and was soon performed. His right foot, heel, ankle and thigh were likewise fractured, crushed and broken, the skull and facial bones surrounding his right eye were likewise crushed and broken, and the muscles and tendons in that region were cut and lacerated to such an extent that he lost partial control of the eye, although the sight was not impaired. He remained in the hospital for many weeks during which time a gangrenous infection set up in the left leg and it again was amputated but still below the knee.

The foregoing reveals substantially the details of the injuries for which appellee claimed total and permanent incapacity for the full statutory period of 401 weeks, and for which he was granted judgment by the trial court to be paid in a lump sum, in

accordance with his allegations and prayer therefor.

The first contention of appellant which we shall discuss is presented by its points 7 to 11, inclusive, and under which it contends the court erred in submitting the case as for general and permanent injury and in not submitting special issues requested by it concerning specific injuries to his legs, as provided by Section 12 of Article 8306, R.C.S. In reply to this contention, appellee asserts that the assignments are not well taken because he alleged, and the jury found, general injuries and total incapacity as a result thereof; that he did not allege, in the alternative or otherwise, that his injuries were specific or confined to specific members of his body; and that appellant confined its pleadings to a general denial and filed no affirmative pleadings to the effect that appellee sustained specific injuries instead of a general injury, as contended for by him.

In the first place, appellant was under no duty to plead the case for appellee. He was the plaintiff in the case and as such it was his duty to plead the case which he expected to make by his testimony. It is well settled by the decisions that in a case where an injury to a specific member of the body constitutes the basis of a claim for compensation and the claimant seeks to recover for a general injury, the burden rests upon him not only to plead, but to secure a finding, that other portions of his body were affected by diseases or infections naturally resulting from the injury, as provided by art. 8309, R.C.S., Vernon's Ann.Civ.St. art. 8309. Consolidated Underwriters v. Langley, 141 Tex. 78, 170 S.W.2d 463. Appellee made no such allegations nor does the evidence reveal that any disease or infection resulted from the injuries received by him. In the second place, we think appellee alleged a case of specific injuries. His allegations were to the effect that his left leg was fractured and crushed, so that it had to be amputated below the knee, and he suffered the complete loss of that portion of his leg. He alleged further that the heel of his right foot and his right thigh bone were fractured and the evidence showed it had healed but, by reason of the injury, it was shorter than it normally had been. He alleged further that the bones and muscles of his head and particularly in the region of his right eye were crushed and lacerated so that the use of his right eye had been impaired. It is true he further alleged that by reason of these injuries he was totally and permanently incapacitated to labor and earn money, and he prayed for judgment accordingly, but the latter allegations were general in their nature and constituted conclusions of the pleader. No allegations of fact were made which removed the pleading from the rule that such general allegations will not support a judgment rendered thereon. His pleadings were sufficient to entitle him to recover compensation for the injuries to his legs and his eye, but he makes no contention in his pleadings nor did he produce any evidence that any diseases or infections naturally resulted therefrom, and he was therefore not entitled to recover for total and permanent incapacity resulting from a general injury. Traders & Gen. Ins. Co. v. Marrable, Tex.Civ.App., 126 S.W.2d 746.

Notwithstanding the fact that neither the pleadings nor the proof revealed any diseases or infections resulting from specific injuries received by appellee, the court submitted the case upon the theory which appellee contends was presented by his pleadings, that is, that he had received a general injury. All of the special issues presented by the appellant seeking findings of the jury concerning specific injuries were refused by the court and, in adopting the wrong theory in presenting the case to the jury, error was committed, for which the case will have to be reversed. Appellee was entitled to recover, if at all, for the loss of his left foot, for the injuries he received to his right leg and his right eye, under the specific provisions of Section 12 of Article 8306, R.C.S., and upon another trial that phase of the case should be submitted upon that theory and not upon the theory that appellee had received a general injury. Texas Employers' Ins. Ass'n v. Pierson, Tex.Civ.App., 135 S.W.2d 550; Texas Employers' Ins. Ass'n v. Ray, Tex.Civ.App., 68 S.W.2d 290; Texas Employers' Ins. Ass'n v. Maledon, Tex.Com.App., 27 S.W.2d 151.

The next contention of appellant is presented by the group of assignments in which

it contends that the court erred in overruling its motion for an instructed verdict and that the answer of the jury to special issue number two, to the effect that appellee's injuries were received while in the course of his employment, was without support in the testimony. Under these assignments of error, appellant asserts that the appellee was not entitled to recover anything because, at the time he received his injuries, he had stepped aside from the duties of his employment and was engaged in an act wholly disconnected therefrom. Article 8309, R.C.S. defines an employee to mean every person in the service of another under any contract of hire, except one whose employment is not in the usual course of the trade, business, profession or occupation of his employer. It is provided, however, that an employee who is employed in the usual course of the trade, business, profession or occupation of an employer, and who is temporarily directed or instructed by his employer to perform services outside of the usual course of trade, business, profession or occupation of his employer, is also an employee while performing such service pursuant to such instructions or directions. According to the testimony, the operation of gliders was not a part of the business, trade or profession of appellee's employer, Breedlove. He owned a glider but it had been kept constantly stored in one of his hangars and had never been used at the airport. None of his students was being taught to operate or pilot gliders. All of the business and activities pertaining to the airport, or in which Breedlove or any of his employees were engaged, pertained to powered airplanes. M. I. Hall owned a glider and it was stored at the airport but he had no connection with the aerial service of Breedlove and maintained the glider solely for his own amusement and pleasure. Val Williams was the general manager of the airport and an employee of Breedlove and it is shown by the evidence that he and M. I. Hall had discussed the feasibility of inaugurating a glider service at, and in connection with, the airport, and the discussions had proceeded to the point where they seemed tentatively to have agreed that the service would be inaugurated about noon February 24, 1946, the day appellee received his injuries. Appellee contends that they had so agreed and that the airplane pilots then employed at the airport would operate the glider. There was no suggestion that other gliders would be procured but that Hall's glider would be used and that when Hall was not present the other employees of the airport would act as pilots of the glider. It was further contemplated by them that a charge of five or six dollars for each flight would be made and that Hall would receive 40 per cent of the proceeds and Williams 60 per cent thereof. Appellee contends in his brief that he entered the glider on the occasion in question for the purpose of acquainting himself with its operation so that he might act as a glider pilot in the future. He further asserts that he was instructed to do so by Val Williams, the general manager of the airport, and, by reason of all these things, he was acting within the scope of his employment and within the usual course of the trade, business, profession or occupation of his employer, Breedlove.

The testimony does not warrant the conclusion that appellee was "instructed" or "directed" by Williams to make the flight with Hall. Williams denied that it amounted to an instruction or direction. He said he "stated" to appellee that appellee would make the first flight and he would make the second. Breedlove testified that pilots were not instructed or required to make flights even in the airplanes. He said that no one was ever ordered to get into a plane or make a flight; that "It is up to the pilot. If he wants to refuse to go, he can refuse to go, or whatnot". Appellee testified that the reason he made the flight in the glider was that he wanted to learn the flight characteristics and the effect it would have on the tow-plane. He did not claim in his testimony that he was instructed or directed by any one to make the flight.

Whether the statement of Williams amounted to an instruction or not, however, the testimony is conclusive that appellee's employer, Breedlove, did not instruct appellee to make the flight and it wholly fails to connect him in any way with the proposed glider enterprise. It is not shown that he gave Williams any authority to direct appellee to make the flight nor

does the testimony connect him in any way with the arrangement between Williams and Hall to inaugurate the glider service. Breedlove testified that he was present at a conversation between Hall and Williams in Breedlove's office and that they were talking about starting a glider club and were planning courses in glider training. The conversations between Williams and Hall indicate the proposed glider service was to be the enterprise of Hall and Williams. It does not appear that Williams purported to represent Breedlove or to bind him to the agreement with Hall but even if he had purported to represent Breedlove, the testimony reveals no authority from Breedlove under which he was authorized to do so. Breedlove testified that Williams was the general manager of the airport and that his duties were to manage all of the operations there, including aircraft sales, supervising the mechanics, pilots and flying operations, and anything that might be under the airport setup, covering all the operations the airport had to offer. There is no testimony to the effect that Williams had authority beyond that which was designated by Breedlove and perhaps implied from his designation as manager. The implication goes no further, however, than Breedlove's testimony, that is, that he had no further authority than to manage the airport and conduct the business that was than being operated by Breedlove. There is no testimony to the effect that he had authority as Breedlove's agent to add to the business that was then being carried on and take into it the additional glider service, nor to arrange for any sort of a partnership between Breedlove and Hall in connection with it. The compensation insurance policy issued by appellant insured Breedlove and his employees. It did not cover Williams further than perhaps to extend to him compensation insurance as an employee of Breedlove. It would seem to follow from these observations that if appellee entered the glider and made the flight with Hall he thereby, for the moment, turned aside from his employment with the Breedlove Air Service and was not engaged in the course of trade, business, profession or occupation of his employer at the time he received his injuries. It is well settled

by many decisions of our courts that compensation insurance such as that held by Breedlove under which appellee seeks to recover extends only to injuries incurred while the employee is engaged in the employment, and when they result from some peril, risk or hazard inherent in or incident to the conduct of the work or business of the employer. If the employee turns aside from his employment and engages in some activity outside of the duties of his employment and is injured, he cannot recover under our compensation law, even though he might, at the time, have been upon the premises where he was employed. Smith v. Texas Employers' Ins. Ass'n, 129 Tex. 573, 105 S.W.2d 192; Davis v. General Accident Fire & Life Assur. Corporation, Tex. Civ.App., 127 S.W.2d 526; Texas Employers Ins. Ass'n v. Ferguson, Tex.Civ.App., 196 S.W.2d 677; Graves v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 197 S.W.2d 596.

■ Under the testimony revealed by the record now before us, it is our opinion that the court below erred in refusing to give to the jury an instructed verdict, as requested by appellant, but we are not convinced the case was fully developed and for that reason, we do not feel warranted in entering an order beyond that of remanding the case for another trial.

Appellee presents and urges a cross assignment of error to the effect that the court erred in sustaining exceptions to his pleadings and excluding evidence offered by him under which he sought to recover expenses incurred by him for medical and hospital services after the first 28 days following his injury. He does not contend that notice was given by his physician to the Industrial Accident Board of the necessity for such expenses, as provided by Section 7 of Article 8306, R.C.S., Vernon's Ann, Civ.St. art. 8306, § 7, and the record fails to reveal any such notices either to the Industrial Accident Board or the appellant. He contends, however, that inasmuch as the Industrial Accident Board denied his claim for any compensation, such notices were not necessary. It has been held by our courts that where the compensation insurance carrier, prior to the expiration

of the first 28 days following the injury, denies all liability for hospital services and gives notice that it will not pay for them, it becomes unnecessary further to notify or make claim to the insurer prior to the furnishing of such services or to notify it of applications to the Board for their extension. Security Union Casualty Co. v. Roberts, Tex.Civ.App., 298 S.W. 164. In that case, however, the Industrial Accident Board was notified of the necessity for additional hospital and other services, and in Federal Underwriters Exchange v. Brigham, 184 S.W.2d 849, the Court of Civil Appeals at El Paso made a distinction in a case where the Accident Board had been notified from a case where no notice had been given either to the Board or to the insurance carrier and held that the necessity for certification to the Board is mandatory. In the later case of Great American Indemnity Company v. Beaupre, 191 S.W. 2d 883, the Dallas Court of Civil Appeals held that, as the defendant had denied all liability to the plaintiff, it was not incumbent upon him to comply with the provisions of either Section 7 or Section 12e of Article 8306.

Appellee contends that, since the Industrial Accident Board denied him any compensation whatever, upon the ground that appellant was not liable for either compensation or expenses, it was not necessary for him or his physician to give such notices either to the Board or to the appellant. He does not direct us to any portion of the record which reveals the date upon which the Board denied his claim for compensation nor which reveals any knowledge of appellant that additional medical and hospital services were required. We are, therefore, unable to pass directly upon his cross assignment of error. Under the holdings of Security Union Casualty Co. v. Roberts, supra, if it is shown that appellant had such notice and knew that additional expenses were necessary and it had denied all liability therefor, notice to it would not have been necessary and, likewise, if the Industrial Accident Board denied appellee's claim before the additional medical and hospital expenses were incurred, we think notice to the Industrial Accident Board would not have been required.

If, however, the expenses were incurred prior to the time the Industrial Accident Board denied appellee's claim for compensation, we think it was necessary that the Board be notified in the manner provided by the statute for such expenses as were necessary up to the date it denied appellee's claim for compensation. If both the appellant and the Industrial Accident Board denied all liability of appellant, it would follow, we think, that the consent of both for additional medical and hospital services, if given, would likewise have been denied and notices to them would, therefore, have been a vain and useless thing.

The judgment of the court below will be reversed and the cause remanded for another trial.